# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　Plaintiff-Appellee,

v

DARREN ALLEN DUFFINEY,

　　　　　Defendant-Appellant.

UNPUBLISHED
April 3, 2018

No. 333378
Oakland Circuit Court
LC No. 2015-255461-FH

Before: CAMERON, P.J., and SERVITTO and GLEICHER, JJ.

GLEICHER, J. (*concurring*).

Defendant's brief on appeal ranks ineffective assistance of counsel as the first issue presented. The heading for this issue declares that trial counsel "was disorganized, unable to follow the court's rulings, inappropriately focused on minutiae, could not properly impeach witnesses, and was entirely unable to provide an effective defense." It continues, "Furthermore, counsel made egregious errors including . . . ." The heading identifies three examples: counsel's introduction of evidence that the complainant was afraid of defendant, defendant's insistence that the jury view the video of defendant's interrogation despite that it revealed defendant's prior conviction for criminal sexual conduct, and defendant's failure to request a jury instruction for criminal sexual conduct in the fourth degree.

The majority limits its analysis to the last three ineffectiveness claims. According to the majority, the first two arguments listed after "including" are unavailing as trial counsel's choice to delve into the complainant's fear qualified as trial strategy and the attempted introduction of the video evidence failed, occasioning no prejudice. The majority finds the jury instruction contention unwarranted. These are easy answers to the three *subpoints* appellate counsel raised in her statement of the issues presented, and I do not disagree with the majority's resolution of them.

In my view, however, appellate counsel properly framed a much wider issue for this Court's review—whether defense counsel "was disorganized, unable to follow the court's rulings, inappropriately focused on minutiae, could not properly impeach witnesses, and was entirely unable to provide an effective defense." Appellate counsel devoted more than two dozen pages of her brief to recounting trial counsel's rambling disjointed questions, his utterly ineffective cross-examinations, and his pointless concentration on collateral and largely irrelevant evidence.

- 1 -

Appellate counsel's concerns about the adequacy of defendant's representation are not meritless.  I reprint here just a couple of the examples of trial counsel's performance cited in appellate counsel's brief.  In combination with the rest of the transcript, these segments suggest that counsel lacked focus and basic trial skills.[1]

The first excerpt displays defense counsel's efforts to test the complainant's memory:

*Q*.  Okay.  Now, Ms. [J.], there's a web page of you that I asked you about on December the 1st, 2015, that shows that you had interest in acting and modeling; do you remember those questions?

*A*.  Yes.

*Q*.  Okay.

*Ms. Brown*:  Your Honor, I object to the relevance of that, of what her interests were.

*The Court*:  Overruled at this time.

*By Mr. Lewis*:

*Q*.  And Ms. [J.], you went - - you testified that you attended Oakland Community College a/k/a OCC, correct?

*A*.  Yes.

*Q*.  And you attended that school from what year to what year?

*A*.  Oh, I went off and on for a couple years.  I can't - -

*Q*.  Take your time - -

*A*.  - - remember the exact dates right now.

*Q*.  Pardon me?

*A*.  I can't remember the exact dates right now.

*The Court*:  Go ahead, counsel, please.

*Mr. Lewis*:  Are you ready, Ms. [J.]?

*The Witness*:  Yes.

*By Mr. Lewis:*

---

[1] Counsel refers to the complainant by her last name, which I have shortened to "Ms. J."

*Q*. Now, the - - are you available to continue, Ms. [J.]?

*A*. Yes, I've been ready.

*Q*. Now, does 2012 to 2015 sound just about right for you attending OCC?

*A*. No.

*Q*. So since it doesn't sound right, tell the jury when you attended OCC?

*A*. I - - I don't remember the exact dates?

*Q*. So how it [sic] that you're able to dispute it was 2012?

*A*. That's not the one I was disputing. I was disputing that it was 2015.

*Q*. Okay. So you are in agreement with me that you attended OCC in 2012?

*A*. I think it was from 2011, off and on, until 2014, but I'm not sure exactly.

*Q*. Ms. [J.], I'm going to refer you to page 57 of the thick transcript, to refresh your recollection. And tell me when you read it.

*A*. Okay.

*Q*. Now, does that refresh your recollection as to when you attended OCC?

*A*. Actually, it says right there that I stated - -

*Q*. Does that refresh your recollection as to when you attended OCC?

*A*. It - -

*Q*. That's a yes or a no, ma'am.

*A*. Yes, as I stated right here, I don't remember exactly. I went on and on for . . . a couple years.

*Q*. Okay. So it does refresh your recollection as when you attended OCC? Now let's go - -

*Ms. Brown*: Your Honor - - no, just one moment, if I may make an objection.

Your Honor, this is asked and answered. She - - he asked - -

- 3 -

*The Court*:  Sustained.

The next excerpt continues trial counsel's seemingly interminable cross-examination of the complaining witness.  In this section, counsel questioned the complaining witness about her reaction to the closing arguments during the first trial (which resulted in a mistrial):

*Q*.  Now, Ms. [J.], you say your behavior was far worse than what it was in the courtroom on December the 3rd, correct?

*A*.  Yes.

*Q*.  Now, do you remember your behavior being such that you went up under the pew on December 3rd and you were like - - you were convulsing; do you remember that?

*A*.  I wasn't convulsing; I was having a panic attack.

*Q*.  Oh, you was [sic] having a panic attack.  But you do not dispute that you went up under the pew, correct?

*A*.  I was not under - -

*Ms. Brown*:  Your Honor - -

*The Witness*:  -- a pew.

*Ms. Brown*:  And Your Honor, she's asked and answered.

*The Court*:  I got the answer.  Move on.  Go ahead.

*By Mr. Lewis:*

*Q*.  Ms. [J.] - -

*A*.  I was sitting on the bench thingy right there.

*Q*.  Okay.  So - -

*A*.  I did not get on the ground; I did not go underneath it.

*Q*.  Okay.  And the woman right there in the red hair, she was here on December 3rd, wasn't she?

*A*.  No, she wasn't.

*Q*.  She wasn't?

*A*.  No.

*Q.* Okay. But you had a friend that was here on December 3rd, correct?

*A.* Yes, I did.

*Q.* Okay. And that friend was - - was helping you, correct?

*A.* Yes.

*Q.* Along with the . . . representative from the prosecutor's office, correct?

*A.* Yes.

*Q.* Okay. And they helped calm you down, right?

*Ms. Brown*: Your Honor, objection as to relevance.

*Mr. Lewis*: Judge, it's relevant because she said she was in a much - - she was in a worse condition than what she was - -

*The Court*: Take - - I'll take the answer, ma'am.

*Mr. Lewis*: Thank you.

*The Court*: Just answer - - just answer the question, and move on after that.

*The Witness*: I was calmed down a little bit, but I was still infuriated and mad and betrayed.

*By Mr. Lewis:*

*Q.* And it took those two people to calm you down - -

*The Court*: Let's move on - -

*By Mr. Lewis:*

*Q.* - - fair statement?

*The Court*: Let's move on. Let's move on, counsel.

Next is another effort at testing the memory of the complainant's neighbor:

*Q.* Okay. Now, when did this leasing woman and this secretary that you mentioned on yesterday come into the picture?

*A.* Just the secretary.

*Q.* The secretary?

*A.* Yes.

*Q.* Okay. And what's the name of the secretary?

*A.* Melinda.

*Q.* Okay.

*A.* Morgan.

*Q.* And you know her to be a secretary how?

*A.* That's who I pay my rent to.

*Q.* Okay. And this secretary, she's not the leasing woman, correct?

*A.* She - - she does leases too.

*Q.* So would you classify - - but you specifically classifies [sic] her as the secretary, correct?

*A.* She works the front office at Laketree, so she handles everything that comes in there, and then she disburses whatever situation that comes about to the proper people in the office.

*Q.* So - -

*A.* I mean she - - she has more than one job, but she is like the main secretary there; she handles everything.

*Q.* Okay. And where did you come in contact with as you quote the secretary on this particular day?

*A.* Where did I come in contact with her? She was up on the - - it would have been the second floor, she walked out of the office and was standing at the top of the stairs.

*Q.* She - - she was standing at the top of the stairs - -

*A.* On the second floor.

*Q.* On the second floor.

*A.* Yes.

*Q.* And you were on the bottom floor?

*A.* I walked up. I was on the main landing when you walk in the very front door.

*Q.* Right. Now, I may have misunderstood you. When you walk into the building, that's the main landing?

*A.* I call it the main landing, yeah.

*Q.* Okay. Let's go with you - - it's the main landing.

*A.* Correct.

*Q.* You - - and you have to go down a flight of stairs to get to my client's apartment, correct?

*A.* Yes.

*Q.* Okay. Now, this secretary/leasing lady/manager/whatever she is - -

*A.* Yes.

*Q.* - - is she on the main landing as you state?

*A.* Not with me, no.

*Q.* Okay. No.

*A.* She was up on the second floor.

*Q.* So she - - she's not on the main landing as you come into the door?

*A.* No.

*Q.* Okay. Now - - and she's up on the second floor, you're on the bottom floor, so how did you come in con - -

*A.* I'm not on the bottom floor; I'm on the main floor - - like the main landing. I'm not down – I'm not on the bottom floor by his apartment - -

*Q.* As of yet - -

*A.* - - I walked upstairs and I'm on the main landing, and she walked out. You asked me how did I - -

*Q.* Come in contact with her.

*A.* Right. And that's how I came in contact with her.

*Q.* Oh - - oh - -

*A.* I was on the main landing, she came out of her office on the second floor, she was standing at the top, I was standing at the bottom, and I was looking up talking to her, because she was asking what was going on.

*Q.* Okay. Now, in what sequence of events did she come to ask you what was going, before you went down the stairs to my client's apartment - -

*A.* She heard me kicking and hitting his door.

*Q.* Okay. And so if she heard you kicking and hitting his door, you are at the apartment on the bottom of the ground floor kicking his door, correct?

*Ms. Brown*: Your Honor, this is - - and this is asked and answered with respect to the sequence of events. She's indicated multiple times - -

*The Court*: Okay. I got it. I'll - - I'll take the answer and we'll - -

*Mr. Lewis*: Thank you.

*The Court*: -- move - - move on, counsel.

And finally—just by way of example, as I do not want to type in most of the transcript—here is yet another of trial counsel's poorly executed efforts at making a point about memory, this time on the part of the investigating detective:

*Q.* Now, isn't it true that my client said that he walked her to the door, Detective?

*A.* He said that she gathered - -

*Q.* Not what she said, Detective; I'm asking you what my client told you in this recorded interview, and I'll repeat the question. Isn't it true that my client said he walked Ms. [J.] to the door?

*A.* I believe what he said is he opened the door for her. I - -

*Q.* My exact words was, Detective - -

*The Court*: Just ask another question, counsel.

*Mr. Lewis*: Judge the - -

*The Court*: You - -

*Mr. Lewis*: -- we can - -we can have - -

*The Court*: Just as [sic] it over again. Just ask it over again - -

*Mr. Lewis*: Okay.

- 8 -

*The Court*:  - - instead of repeating what you may or may not have said earlier.  Just ask the question.

*By Mr. Lewis:*

*Q*.  Detective, isn't it true that my client told you he walked Ms. [J.] to the door?

*A*.  I don't recall that.  If - - if - -

*Q*.  Okay.  Now - - and we both have the DVD here, so do - - do you believe that looking at the DVD would refresh your recollection?

*A*.  If that's what we want to do, yes.

*Mr. Lewis*:  Judge, we have a situation.

*The Court*:  Well, no we don't have a situation.  You may - - you may leapfrog to some other line - -

*Mr. Lewis*:  Okay.

*The Court*:  - - of question, and then we'll attend to that one later.

*Mr. Lewis*:  Okay.  Okay.

Although decisions about how to cross-examine a witness and whether to delve deeply into collateral matters are usually strategic, I discern no plausible strategy that would justify counsel's obsession with minutiae.  His bumbling and long-winded cross-examinations made no useful points that I can discern and likely alienated the jury, to the extent the jurors even remained awake.  Does this equate with ineffective assistance of counsel, as appellate counsel contends?

This is not an easy question to answer.  The transcript reveals that the trial judge intervened often and decisively to redirect defense counsel so as to keep the cross-examinations at least minimally on track.  Counsel certainly presented a *zealous* defense, even though his questioning seemed fuzzy and not well planned.  Counsel was prepared, had investigated the case thoroughly, and knew the lengthy record well.  The test given to us in *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052, 2065; 80 L Ed 2d 674 (1984), is whether counsel has brought "to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  Viewing the record as a whole, I conclude that he did.

Even if we opted to focus more critically on counsel's performance, I cannot say that but for any errors, a reasonable probability exists that the outcome of the trial would have been different.  The testimony of the complaining witness remained consistent and unwavering throughout her lengthy cross-examination.  Other witnesses corroborated important aspects of her testimony.  Nothing that emerged during the trial or that has been brought to our attention on

appeal supports that more effective cross-examinations likely would have led to defendant's acquittal. On this basis, I concur with affirming his convictions.


/s/ Elizabeth L. Gleicher